IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

LEONARD SNIDER, et al.,            )
                                   )
                Plaintiffs,        )
                                   )
        v.                         )      Case No. 01-4256-CV-C-SOW
                                   )
UNITED STATES OF AMERICA,          )
                                   )
                Defendant.         )
_____

THERESA J. TURLEY, et al.,         )
                                   )
                Plaintiffs,        )
                                   )
        v.                         )      Case No. 02-4066-CV-C-SOW
                                   )
UNITED STATES OF AMERICA,          )
                                   )
                Defendant.         )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. Procedural Background

Plaintiffs Leonard Snider (hereinafter "Snider") and National Sales & Service, L.L.C., a

Missouri limited liability company (hereinafter "NSS") filed a civil Complaint on December 19,

2001, pursuant to 26 U.S.C. §7431, alleging numerous disclosures of taxpayer return information

in violation of 26 U.S.C. § 6103 by Special Agent Robert Jackson.  Plaintiffs Theresa Turley

(hereinafter "Turley") and Labor Resources, L.L.C. filed a similar civil Complaint on April 17, 2002,

alleging numerous disclosures of taxpayer return information in violation of 26 U.S.C. § 6103.  In

early 2002, both cases were stayed initially for six months and subsequently stayed until August

1

2003. The grand jury investigation is currently pending. No indictments or criminal charges have yet been issued.

The two civil Complaints were consolidated for trial on February 19, 2004. Plaintiff Labor Resources, L.L.C. dismissed its Complaint prior to commencement of trial on May 3, 2005.

On May 3rd, and May 4th, 2005, and on May 9th and May 10th, 2005, appeared plaintiffs Leonard Snider, in person, and National Sales & Service, L.L.C., a Missouri limited liability company, and their attorneys Jay D. DeHardt and Robert R. McQuain; plaintiff Theresa J. Turley, in person, and her attorneys Jay D. DeHardt and John H. Trader; and defendant United States of America, by and through its attorneys, Angelo A. Frattarelli and Russell S. Clarke. The Court heard evidence from all parties concerning plaintiffs' allegations that Special Agent Robert Jackson of the Internal Revenue Service violated section 6103 of the Internal Revenue Code (26 U.S.C. §6103) by making oral disclosures of plaintiffs' return information to witnesses he interviewed during the course of an on-going criminal investigation.

After hearing the evidence, and reviewing the parties' post-trial submissions, the Court now makes the following Findings of Fact and Conclusions of Law.

## II. Findings of Fact

1. This Court has jurisdiction over the subject matter and the parties hereto and venue is proper.

2. An administrative criminal investigation of plaintiffs was commenced by the Internal Revenue Service, Criminal Investigation Division in July, 2001 to determine whether they had committed criminal violations of Titles 13, 18, 26, and 42 of the United States Code. The investigation focused on the non-payment of income and employment taxes, the employment of illegal aliens, and the filing of false identification documents on behalf of

those individuals during the years 1996 through 2000.

3. The administrative criminal investigation was terminated in favor of a grand jury investigation in May of 2002.

4. The only investigation of Plaintiffs after July of 2002 was conducted through the grand jury.

5. The principal agent of the defendant alleged to have made illegal disclosures of taxpayer return and return information is Special Agent Robert Jackson of the Criminal Investigative Division of the Internal Revenue Service in Kansas City, Missouri (hereinafter "Jackson").

6. At trial, the Court allowed previously excluded plaintiffs' witnesses LaShawn Snider, Mike Parker, Roger Tilling and Noi Martin to testify upon the assurance of plaintiffs that they would not file a second Section 6103 disclosure suit regarding unknown, undiscovered and/or excluded witnesses.

7. Permitting such witnesses to testify in the instant case rather than encouraging a subsequent Section 6103 disclosure suit provided a full hearing of plaintiffs' claims and promoted judicial economy.

8. In 1999, plaintiff Snider formed NSS for the purpose of providing contract workers to the hotel industry around the Lake of the Ozarks, Missouri. After its formation, NSS provided workers to various hotels and businesses in Missouri.

9. In 1999, plaintiff Turley commenced doing business under the name AA Cleaning, through which Turley assisted Snider and NSS in recruiting laborers to meet the staffing needs of its customers. In May of 2000, Turley formed Labor Resources, L.L.C. to act as a subcontractor for NSS.

10. The interviews conducted by Jackson that are at issue in this case were conducted during a

time period beginning in September of 2001, and continuing through February, 2004.

11.    According to the government, the purpose of Jackson's interviews with NSS's customers was to learn the nature of their business arrangements with NSS; what representations Snider had made to NSS's customers; and the details surrounding the contractual arrangement between NSS and each customer.

## Ineke Kirby

12.    Jackson interviewed Ineke Kirby on September 20, 2001.  IRS Agents Dennis Lengyel and Jeffrey Trogden were also in attendance (Exhibit P12).  Kirby is an accountant who performed certain accounting work for plaintiff Turley in 2000 and 2001.  During his interview with Ms. Kirby, Jackson affirmatively stated to Ineke Kirby the following, all of which constituted return information:

   a.    Turley had a big increase in income from 1999 to 2000 that was questionable (Tr. Vol. II, 298:9-10).[1]

   b.    Turley hired illegal immigrants (Tr. Vol. II, 298:10-11).

   c.    Turley was avoiding paying employer taxes (Tr. Vol. II, 299:2-7)

   d.    Jackson showed Turley's 1999 tax return to Kirby, which was the first time she had ever seen it (Tr. Vol. II, 299:20-25, 300:1-9).

   e.    Turley and Snider were involved in money laundering (Tr. Vol. II, 301:23-25, 302:1-

_____

[1]In response to additional questions by counsel, Kirby testified that Jackson stated that "Turley was running a scam" and "Based upon the large increase in Turley's income from 1999-2000 that there must be something going on to show such a big increase from one year to the next." These statements amount to the disclosure of the same information.

4

6).[2]

  f. Turley's workers had fake social security numbers (Tr. Vol. II, 306:2-13).

13. Jackson questioned Kirby about why Turley had not filed an individual tax return for the 2000 tax year. Kirby produced a copy of that return, which Kirby had prepared, and discovered that she had made an error in recording Turley's social security number on the tax return, thereby causing the return to be filed incorrectly. The Court does not find this exchange to be a disclosure of return information.

14. From Ms. Kirby's testimony, the Court finds 1 Section 6103 disclosure as to Snider and 6 Section 6103 disclosures as to Turley.

### Theresa Turley

15. Jackson interviewed Turley on September 20, 2001. IRS Agents Dennis Lengyel and Jeffrey Trogden were also in attendance (Exhibit P12). During that interview, Jackson affirmatively stated to Turley that Snider was laundering money through her (Tr. Vol. III, 626: 2-14). This constitutes a disclosure of return information. In addition, Jackson told Turley that Snider had previously been under criminal investigation (Tr. Vol. III, 625:13-23) and that Snider had previously been investigated for tax fraud (Tr. Vol. III, 625:13-23).

16. From Turley's testimony, the Court finds 3 Section 6103 disclosures as to Snider.

### Mike Bolster

17. Jackson interviewed Mike Bolster on October 3, 2001. IRS Agent Dennis Lengyel was also

---

[2]In response to additional questions by counsel, Kirby testified that Jackson said Turley and Snider were "involved in a scam" and "a grand conspiracy." Again, the Court finds that this amounts to disclosure of the same information multiple times and will not find multiple violations of Section 6103.

Case 2:02-cv-04066-SOW  Document 78  Filed 07/26/05  Page 5 of 28

in attendance (<u>Exhibit P12</u>).  During that interview, Jackson affirmatively stated to Mike Bolster that he was conducting a criminal investigation of Snider (Tr. Vol. I, 218:22-25) and that Snider had not paid payroll taxes (Tr. Vol. I, 219:3-6).  Bolster testified that he did not have any previous information on this topic.  Jackson's statements constitute  disclosures of return information.

18.  From Mr. Bolster's testimony, the Court finds 2 Section 6103 disclosures as to Snider.

### Marjorie Forbis

19.  Jackson interviewed Marjorie Forbis, the housekeeping supervisor at the Knolls Resort, on October 4, 2001.  IRS Agent Dennis Lengyel was also in attendance (<u>Exhibit P12</u>).  During that interview, Jackson affirmatively stated to Ms. Forbis that he was conducting an investigation of Snider and Turley (Tr. Vol. II, 402:13-25).  He also informed Ms. Forbis that Snider and Turley did not pay taxes on the workers (Tr. Vol. II, 410:1-2).  These statements constitute disclosures of return information.

20.  From Ms. Forbis' testimony, the Court finds 2 Section 6103 disclosures as to Snider and 2 Section 6103 disclosures as to Turley.

### Mark Bowman

21.  Jackson interviewed Mark Bowman on October 5, 2001.  Mr. Bowman was the general manager of the Holiday Inn Sun Spree.  IRS Agent Dennis Lengyel was also in attendance during the interview (<u>Exhibit P12</u>).  During that interview, Jackson affirmatively stated to Bowman the following, all of which constituted return information:

a.  Jackson stated that he was there to do a criminal investigation of Snider and he referred to Snider as a criminal (Tr. Vol. I, 35:16-18, 38:23-24).

6

b.      Jackson volunteered that Snider had been investigated before (Tr. Vol. I, 39:9-11).

c.      Jackson stated that there was a criminal investigation of Turley (Tr. Vol. I, 38:19-22).

d.      Snider and Turley were part of a group of four or five people who move money around (Tr. Vol. I, 39:2-16).

e.      He was going to be responsible for the payroll taxes not paid by Snider (Tr. Vol. I, 40:10-25, 41:1-4).

f.      The Holiday Inn Sun Spree contract with Snider was worth nothing and if he (Bowman) wanted to recoup the money, then he would have to sue Snider, but that would be worthless because Snider has no money (Tr. Vol. I, 41:5-14).

g.      The workers were illegals (Tr. Vol. I, 42:20-25).

22.      The Court further finds that Jackson volunteered to Mark Bowman that NSS was not withholding taxes or paying them over to the U.S. Treasury, and that the Holiday Inn Sun Spree could be civilly liable for said taxes.

23.      From Mr. Bowman's testimony, the Court finds 7 Section 6103 disclosures as to Snider, 1 Section 6103 disclosure as to NSS and 3 Section 6103 disclosures as to Turley.

**Rozchelle Eidson**

24.      Jackson interviewed Rozchelle Eidson on October 20, 2001. IRS Agent Dennis Lengyel was also in attendance (Exhibit P12). During that interview, it was affirmatively stated to Rozchelle Eidson that there was a grand conspiracy to commit fraud by Snider, Turley and Chavez by not paying their taxes (Deposition of Rozchelle Eidson, 107:2-22). Jackson asked whether Edison was aware that Snider and Turley had committed a crime (Deposition of Rozchelle Eidson, 107:2-11).

7

25.     From Ms. Eidson's testimony, the Court finds 2 Section 6103 disclosures as to Snider and 2 Section 6103 disclosures as to Turley.

<u>**Cathrin Roberts**</u>

26.     Jackson interviewed Cathrin Roberts on October 25, 2001.  Ms. Roberts is the daughter of plaintiff Turley.  IRS Agent Dennis Lengyel was also in attendance (<u>Exhibit P12</u>).  During that interview, Jackson affirmatively stated to Cathrin Roberts the following, all of which constituted return information:

a.      Jackson was there to do a criminal investigation of Snider and Turley (Tr. Vol. III, 554:22-25, 555:7-25).

b.      Snider had been in this tax thing before with illegals (Tr. Vol. III, 554:22-25, 555:7-25).

c.      With respect to Turley and Snider, there were thousands and thousands of dollars and the IRS wanted to know where it was going (Tr. Vol. III, 554:22-25, 555:7-25).

d.      Turley and Snider were part of some huge money conspiracy (Tr. Vol. III, 554:22-25, 555:7-25).

27.     From Ms. Roberts' testimony, the Court finds 4 Section 6103 disclosures as to Snider and 3 Section 6103 disclosures as to Turley.

<u>**Roger Tilling**</u>

28.     Jackson interviewed Roger Tilling on October 30, 2001 (<u>Exhibit P12</u>).  Tilling is a semi-retired accountant who once performed some accounting services for plaintiff Snider.  During the interview, Jackson asked whether Snider had used subcontractors in a janitorial business he once operated.  Tilling testified that Jackson used the phrase "multi-tier

8

independent contractors" (Tr. Vol. II, 364:16 - 365:1).

29. From Mr. Tilling's testimony, the Court does not find any Section 6103 disclosures as to Snider or Turley.

**Jennifer Fry**

30. Jackson interviewed Jennifer Fry on November 1, 2001. Ms. Fry performed clerical work for plaintiff Turley's business. Ms. Fry's signature was on many of the I-9 Forms (Employment Eligibility Verification forms) plaintiffs had furnished to NSS's customers. IRS Agent Dennis Lengyel was also in attendance (Exhibit P12). Jackson informed Ms. Fry that he was there conducting a criminal investigation of Turley and Snider (Tr. Vol. II, 242:19-25, 243:1-17).

31. During that interview, the agents questioned Ms. Fry about the work she had performed for plaintiff Turley and/or plaintiff Snider (II Tr. 266:23 - 267:15). Ms. Fry was asked detailed questions about her preparation of the I-9 Forms on plaintiffs' behalf. Specifically, Ms. Fry was asked about the documentation she had been given in order to prepare the forms and whether she had verified the accuracy of the forms and identification cards (II Tr. 268:12 - 271:21; 290:1 - 12: IV Tr. 835:5 - 836:3).

32. Jackson showed Ms. Fry a stack of Turley's Form I-9 records, some of which she had never seen before and which had Catherin Roberts's signature on them. (Tr. Vol. II, 245:9-24, 246:1-25, 247:1-25, 248:1-2). Although Jackson also showed Fry a stack of social security card records which Fry had never seen before, written bank checks, and a bank statement, he did so in an effort to determine if Ms. Fry had reviewed any of the social security card records in the course of preparing Form I-9 records for plaintiff Turley. (Tr. Vol. II 268:12 -

9

271:21; 290:1 - 12: IV Tr. 835:5 - 836:3). In addition, one of the areas of inquiry was whether Ms. Fry had written bank checks against Ms. Turley's bank account and the purpose of those disbursements. (Tr. Vol. II 267:19 - 268:11). Therefore, it was reasonable for Jackson to show Ms. Fry certain bank records of interest to determine if she had written the checks.

33. Jackson affirmatively stated to Jennifer Fry that all the workers were illegal and that Turley's I-9 forms had been filled out incorrectly and may be fraudulent (Tr. Vol. II, 243:20-25, 244:1-9, 245:3-16, 254:3-16, 287:2-14). The Court finds that this disclosure consisted of return information.

34. From Ms. Fry's testimony, the Court finds 5 Section 6103 disclosures as to Turley and 1 Section 6103 disclosure as to Snider.

### Greg Fry

35. Greg Fry is Jennifer Fry's husband and was with Jennifer while she was interviewed by Jackson:

    a.    The parties have stipulated that Greg Fry heard everything Jennifer heard from Jackson (Tr. Vol. II, 233:1-21).

    b.    Greg Fry was in the house and present during Jackson's entire interview of his wife, Jennifer, and he heard what they said (Tr. Vol. II, 286:3-13) and saw Jackson show documents to his wife, but he could not entirely see what those documents were (Tr. Vol. II, 286:14-25).

36. The Court finds that the showing of documents to Jennifer Fry did not constitute Section 6103 disclosures to Grey Fry.

10

37. From Mr. Fry's testimony, the Court finds 4 Section 6103 disclosures as to Turley and 1 Section 6103 disclosure as to Snider.

### Herb Baker

38. Jackson interviewed Reverend Herb Baker on November 2, 2001. IRS Agent Dennis Lengyel was also in attendance (Exhibit P12). During that interview, Jackson affirmatively stated to Reverend Baker that Snider and NSS were under investigation (Tr. Vol. I, 68:10-20). Jackson also made the following statements which constituted return information:

   a.  That plaintiff Snider was part of a conspiracy with Tan-Tar-A regarding Latino, alien, and illegal alien workers (Tr. Vol. I, 68:10-20).

   b.  Plaintiffs Snider and NSS were not paying taxes (Tr. Vol. I, 68:10-20).

39. From Reverend Baker's testimony, the Court finds 3 Section 6103 disclosures as to Snider and 2 Section 6103 disclosures as to NSS.

### Amelia Cortez

40. Jackson interviewed Amelia Cortez on January 23, 2002. IRS Agent Dennis Lengyel was also in attendance (Exhibit P12). Cortez provided translating services for some of NSS's workers and occasionally ran errands for NSS (Tr. Vol. II, 356:12 - 358:10). Jackson informed Ms. Cortez that he was investigating NSS (Tr. Vol. II, 349:19-21). The Court finds 1 Section 6103 disclosure as to NSS based upon Ms. Cortez's testimony.

### Donald Hofstetter

41. Jackson interviewed Donald Hofstetter on January 24, 2002. IRS Agent Dennis Lengyel was also in attendance (Exhibit P12). Mr. Hofstetter is plaintiff Snider's insurance agent and Jackson volunteered to him that he was doing a criminal investigation of Snider (Tr. Vol. I,

11

120:17-21). The Court finds 1 Section 6103 disclosure as to Snider based upon Mr. Hofstetter's testimony.

### The Gennettens

42. Jackson interviewed Nina Gennetten and Gene Gennetten sometime during 2003, and after the Complaints of Snider and Turley had been filed (Tr. Vol. I, 89:4-10, 112:14-16). There was also another IRS agent in attendance, but the record does not reflect that agent's name. During that interview, Jackson affirmatively stated to Mr. and Mrs. Gennetten that he was conducting a grand jury investigation of Snider (Tr. Vol. I, 91:6-11, 92:8-9, 106:9-15). Jackson also stated the following, all of which constituted return information:

With respect to Mrs. Gennetten

    a.    Snider had not paid the payroll taxes on the "Spanish workers" (Tr. Vol. I, 91:12-16).

    b.    Snider had not paid income taxes (Tr. Vol. I, 91:17-19).

    c.    Snider had not paid any of the workers' compensation contributions (Tr. Vol. I, 91:19).

    d.    All of Snider's Spanish workers were illegal (Tr. Vol. I, 91:20).

With respect to Mr. Gennetten

    a.    Snider was not paying workmen's compensation contributions (Tr. Vol. I, 106:9-25).

    b.    Snider had not paid social security contributions (Tr. Vol. I, 106:9-25).

    c.    Snider had hired a bunch of illegal aliens to farm out to people like us (Tr. Vol. I, 106:13-15, 106:23-25).

    d.    Snider had more people up in Kansas City working (Tr. Vol. I, 107:6-9).

43. From Mrs. Gennetten's testimony, the Court finds 5 Section 6103 disclosures as to Snider.

12

From Mr. Gennetten's testimony, the Court finds 5 Section 6103 disclosures as to Snider.

### Mike Parker

44.  Mike Parker was interviewed by two IRS agents, however, the record does not reflect their names nor does the record reflect the date of this interview. Mr. Parker was the Banquet Manager for the Country Club Hotel. During that interview, it was affirmatively stated to Mike Parker that NSS was not paying their taxes (Tr. Vol. I, 131:18-19, 132:5-6) and that the Country Club Hotel may be responsible for paying those taxes (Tr. Vol. I, 133:1-5). Parker was informed that Snider and Turley were under investigation (Tr. Vol. I, 134:5-6).

45.  From Mr. Parker's testimony, the Court finds 1 Section 6103 disclosure as to NSS, 1 Section 6103 disclosure as to Snider, and 1 Section 6103 disclosure as to Turley.

### Shane Callendar

46.  Jackson talked to Shane Callendar by phone in July, 2003, after the Complaints of Snider and Turley had been filed. Callendar is a criminal defense attorney in Odessa, Texas. During that telephone conversation, Jackson affirmatively stated to Shane Callendar the following, all of which constituted return information:

    a.    There was a criminal investigation of Turley and Snider (Tr. Vol. II, 333:14-25).

    b.    Turley and Snider were using undocumented workers in their businesses (Tr. Vol. II, 333:25, 334:1-18).

    c.    Turley and Snider did not withhold taxes (Tr. Vol. II, 335:14-17).

47.  From Mr. Callendar's testimony, the Court finds 3 Section 6103 disclosures as to Snider and 3 Section 6103 disclosures as to Turley.

13

## Noi Martin

48.     Jackson interviewed Noi Martin in September, 2003, after the Complaints of Snider and Turley had been filed. During that interview, Jackson affirmatively stated to Noi Martin that Snider was under criminal investigation and was harboring illegal aliens (Tr. Vol. III, 576:14-20, 577:11-17). These statements constitute 2 disclosures of return information as to Snider.

49.     From Ms. Martin's testimony, the Court finds 2 Section 6103 disclosures as to Snider.

## Anna Worcester

50.     Anna Worcester received an email from Jackson in October, 2003 (Deposition of Anna Worcester, 23:7-18). The title of the subject matter of Jackson's email was "Leonard Snider Grand Jury Investigation" (Deposition of Anna Worcester, 26:6-15; Exhibit P30).

51.     The Court finds that so entitling the email constitutes 1 Section 6103 disclosure as to Snider.

## LaShawn Snider

52.     With respect to LaShawn Snider, the parties have stipulated that in February, 2004, after the Complaints of Snider and Turley had been filed, she was approached by special agent(s) in Springfield, Missouri who made one affirmative declaration to her that there was a grand jury investigation of Snider (Tr. Vol. III, 533:1-21).

53.     From Ms. Snider's testimony, the Court finds 1 Section 6103 disclosure as to Snider.

## Total Disclosures

54.     Jackson knowingly and intentionally made 78 taxpayer return information disclosures as defined by Section 6103.

55.     The Court finds that Snider suffered 44 Section 6103 unauthorized disclosures.

14

56.     The Court finds that NSS suffered 5 Section 6103 unauthorized disclosures.

57.     The Court finds that Turley suffered 29 Section 6103 unauthorized disclosures.

### John Alanis

58.     Plaintiffs offered the testimony of expert John Alanis on the subject of standards of investigation and investigative conduct for IRS special agents. The Court finds Mr. Alanis's testimony to be immaterial to the issues before the Court.

### Theresa Turley

59.     Turley has failed to meet her burden of proving that the emotional distress and destructive behavior that she claims were caused by Jackson's interview with her were proximately caused by any alleged unauthorized disclosure of her return information to third parties.

60.     The testimony of plaintiff's children, Catherin Roberts and Daniel O'Cain, is irrelevant.

61.     The Court finds the testimony of Dr. Gerald Vandenburg, an expert witness called to offer an opinion as to plaintiff Turley's emotional and mental state, unpersuasive. Dr. Vandenburg's testimony failed to establish any causal connection between the damages plaintiff Turley seeks and the alleged improper disclosure of her return information.

### Special Agent Robert Jackson

62.     Special Agent Robert Jackson was assigned as the lead agent in charge of the Service's criminal investigation into the activities of plaintiff Snider and plaintiff Turley. Jackson became a special agent for the Service in April of 2000. Prior to being assigned to any cases in the field, Jackson received 26 weeks of training at the Federal Law Enforcement Training Center in Glencoe, Georgia. That training included a course on the disclosure rules IRS special agents must follow. Jackson was also provided with a disclosure training manual (Pl.

15

Ex. 13) for his use. The Internal Revenue Manual (Chapter 9) is also available to him as an on-line disclosure reference guide. (Tr. Vol. III, 752:21 - 755:21).

63. Special Agent Jeff Trogden and Revenue Agent Dennis Lengyel were assigned to assist Jackson with the investigation at issue. (Tr. Vol. III, 758:21 - 761:18).

64. Jackson denied making the disclosures identified by the plaintiffs' witnesses.

65. The Court finds that Jackson repeatedly and intentionally engaged in conduct outside the standard of conduct for IRS special agents.

66. The Court further finds that Jackson's Section 6103 disclosures were made knowingly, willfully, and intentionally and were the result of gross negligence as defined by Section 7431(c)(1)(B)(ii).

## Punitive Damages

67. The Court finds that punitive damages as provided by Section 7431(c)(1)(B)(ii) are warranted and necessary to punish the willful behavior and gross negligence of Jackson and to deter such behavior by others similarly situated, trained, and empowered by defendant to conduct such investigations while possessing confidential taxpayer and tax return information about private citizens.

## Alleged Improper Disclosure to the Court

68. The Court finds that Jackson in his March 10, 2002 Declaration (Exhibit P18) filed with this Court made disclosures of taxpayer return information to counsel for the Government and subsequently to this Court about Snider and NSS. The Court does not find that said disclosures constituted improper disclosures under Section 6103.

16

## Statutory Damages

69. The Court finds that Plaintiffs have substantially prevailed with respect to the amount in controversy and with respect to the most significant issue or set of issues presented as defined by Section 7430(c)(4), thereby entitling Plaintiffs to be awarded ***reasonable*** litigation costs, including court costs and attorney fees as defined by Section 7430(c)(i). The Court further finds that the position taken by Defendant was not substantially justified as defined by Section 7430(c)(4)(B).

70. The Court further finds that the actual damages sustained by Snider as a result of the unauthorized disclosures of return information are less than $1,000.00 for each disclosure.

71. The Court further finds that the actual damages sustained by NSS as a result of the unauthorized disclosures of return information are less than $1,000.00 for each such disclosure, other than the disclosure to the Holiday Inn Sun Spree.

72. The Court further finds that the actual damages sustained by Turley as a result of the unauthorized disclosures of return information are less than $1,000.00 for each such disclosure.

## Economic Damages

73. Snider testified as to NSS's loss of revenue from the loss of contracts with the Holiday Inn Sun Spree and The Knolls Condominiums.

74. The evidence adduced at trial demonstrates that the Holiday Inn terminated its contract with NSS after Jackson advised the general manager of the potential for civil liability for payroll taxes due on account of the workers NSS supplied to the hotel.

75. Similarly, the Knolls Condominiums ceased doing business with NSS when it learned that

NSS had breached its contract by supplying undocumented workers.

76. At trial, Snider also claimed damages for the loss of business from other customers, including various Mariott hotels. Snider subsequently conceded these claims during the trial.

77. The Holiday Inn Sun Spree and The Knolls Condominiums both refused to pay outstanding invoices due and owing to NSS after meeting with Jackson.

78. The Holiday Inn Sun Spree refused to pay and still owes NSS $3,638.63 (Tr. Vol. I., 155:6-20; Exhibits D20 and D21).

79. The Knolls Condominiums refused to pay and still owes NSS $6,156.00 (Tr. Vol. I., 155:23-25, 156:1; Exhibits D20 and D21).

80. Snider seeks damages for the lost value of the contracts with the Holiday Inn Sun Spree and The Knolls Condominiums. At trial, Snider testified that the contracts were worth $100,000 - $135,000, collectively. (Tr. Vol. I, 211:10 - 213:12).

81. Snider's testimony as to the value of the contracts was based upon the gross receipts NSS collected from the Holiday Inn Sun Spree and the Knolls Condominiums during the year and a half it serviced the accounts. Snider also acknowledged that he was speculating that NSS would have retained those accounts. (Tr. Vol. I, 200:1 - 206:17).

82. The parties stipulated at trial that NSS's profit margins in 2000 and 2001 were 8% and 7.5%, respectively. (Tr. Vol. II, 232:8 - 233:9). Applying those margins to the gross receipts calculated by Snider results in a net profit of approximately $10,000 per year.

83. Snider acknowledged, however, that he did not lose the income stream generated by the Holiday Inn and the Knolls Condominiums contracts. Rather, Snider received a "consulting fee" from the NSS subcontractor, Unification Services of America, that replaced NSS. (Tr.

18

Vol. IV, 920:22 - 927:16).  Accordingly, the Court finds that Snider is not entitled to future lost profits based upon the termination of the Holiday Inn and Knolls contracts.

84.     Snider suffered an actual economic loss of $9,794.63 based upon Agent Jackson's improper disclosures of return information to the Holiday Inn Sun Spree and the Knolls Condominiums.  Both of those businesses refused to pay NSS for work that had already been performed at the time of the improper disclosure. (Tr. Vol. I., 155:6-20, 155:23-25, 156:1; Exhibits D20 and D21).

## III.  Conclusions of Law

A.     Jackson Made Numerous Disclosures of Plaintiffs' Return Information

Snider, Turley and NSS each contend that Jackson made numerous unnecessary and illegal disclosures of tax return information and taxpayer return information.  Plaintiffs further contend that the alleged disclosures were made repeatedly and intentionally during third-party witness interviews.

Section 6103(b)(2) broadly defines return information as:

> A taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, *whether the taxpayer's return was, is being, or will be* examined or *subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any* tax, penalty, interest, *fine*, forfeiture, *or other imposition, or offense* . . . (emphasis added)

The very purpose of Section 6103 is at issue in this case.  The Eighth Circuit has recognized the need for federal agents to adhere to this non-disclosure section.  In *Diamond v. U.S.*, 944 F.2d 431, 434, 68 A.F.T.R. 2d 91-5607 (8th Cir. 1991), the Court amply described its concern: "In our

19

society, even without actual conviction, the suggestion of criminal activity can transform and devastate an individual's life[.]"

Jackson repeatedly volunteered to his interview subjects that Snider, Turley, and NSS were being investigated for criminal activity. In some cases, he went further and stated that Snider, Turley, and NSS had engaged in numerous criminal activities.

Defendant contends principally that (1) Jackson did not make the disclosures of taxpayer return information, (2) that the third-party witnesses inferred matters from the line of questions asked of the witnesses; or (3) that Jackson's disclosures were within the limits of recognized exceptions, notably Section 6103(k)(6) or Section 7431(b).

The Court must view these competing positions in the light of the trial testimony. This case is uniquely a matter of witness credibility.

At trial, plaintiffs produced 20 disclosure fact witnesses. Their collective testimonies were remarkably consistent in describing repeated, virtually identical, unnecessary disclosures, and provide compelling evidence of a pattern of improper disclosures by Jackson.

The Court notes that disclosure witnesses such as Jennifer Fry, Nina and Gene Gennetten, LaShawn Snider and Anna Worcester all testified that Jackson described the grand jury involvement or investigation. Some of these witnesses were interviewed prior to the start of a grand jury investigation in July, 2002. Describing the existence of a grand jury investigation, existing or not, is synonymous with stating there is a criminal investigation. Describing a grand jury investigation of the subjects has been addressed in at least one case. In *Heller v. Plave*, 657 F.Supp. 95, 59 A.F.T.R. 2d 87-640, 88-1 USTC P 5987 (S.D. Fla. 1987), the court made the following finding of fact which was ruled to be a disclosure of return information:

20

> Defendant's statement to Mr. Resnick that he had pressed charges
> against Plaintiff and that a grand jury was empaneled.

*Heller* at 96; see also *U.S. v. Bischoff*, 72 A.F.T.R. 2d, 93-6580, 94-1 USTC 50,042 (5th Cir. 1995).

Jackson denies making any illegal disclosures and contends the battery of disclosure witnesses must have inferred the alleged disclosures from his line of questioning. It is incredible to suggest that numerous separate disclosure witnesses arrived at exactly the same inferences.

Jackson's credibility was significantly undermined when he attempted to change on direct examination significant testimony from his deposition regarding the issue of what was said to the Holiday Inn Sun Spree and The Knolls Condominiums witnesses regarding the payment of payroll taxes. On cross-examination, it was established that neither Holiday Inn Sun Spree nor The Knolls Condominiums had asked about payroll taxes before that information was conveyed to them by Jackson.

Having found that Jackson made improper disclosures of return information, the Court must determine whether any or all of the disclosures fall within recognized exceptions contained in 26 U.S.C. § 6103(k)(6) and § 7431(b).

B.    The Disclosures of Plaintiffs' Return Information Was Not Authorized Under 26 U.S.C. § 6103(k)(6)

Section 6103(k)(6) provides:

> **(6) Disclosure by certain officers and employees for investigative purposes.** An internal revenue officer or employee and an officer or employee of the Office of Treasury Inspector General for Tax Administration may, in connection with his official duties relating to any audit, collection activity, or civil or criminal tax investigation or any other offense under the internal revenue laws, disclose return information *to the extent that such disclosure is **necessary** in obtaining information, which is not otherwise reasonably available*, with respect to the correct determination of tax, liability for tax, or the

Case 2:02-cv-04066-SOW    Document 78    Filed 07/26/05    Page 21 of 28

amount to be collected or with respect to the enforcement of any other provision of this title.  Such disclosures shall be made only in such situations and under such conditions as the Secretary may prescribe by regulation. (Emphasis added).

Such disclosures are permitted under the following conditions:  ". . .only if the necessary information cannot, under the facts and circumstances of the particular case, otherwise reasonably be obtained in accurate and sufficiently probative form . . . or if such activities cannot otherwise properly be accomplished without making such disclosure."  26 C.F.R. § 301.6103(k)(6)-1(a).  The burden to prove a Section 6103(k)(6) exception is on the Government.  *Jones v. U.S.*, 954 F.Supp. 191 (N. Neb. 1997).

In this case, the unauthorized disclosures were in the form of affirmative statements rather than questions seeking information.  In *Malis v. U.S.*, 87-1 USTC ¶ 9212, p. 87, 352, the court held that, "Disclosures which are in the form of statements--rather than inquiries--and which do not themselves seek information are unnecessary disclosures under 26 United States Code, Section 6103(k)(6)."

Plaintiffs introduced three exhibits (Exhibits P19, P20 and P21) consisting of a letter exchange between Snider's counsel, Robert R. McQuain, and Jackson.  In Exhibit P21, Mr. McQuain complained of the unnecessary adverse effect of third-party contacts and offered to provide relevant tax return documents upon being provided a list of the requested items.  Jackson, either by misinterpretation of the offer or for other unaddressed reasons, never attempted to obtain such documents from Snider.  While a factor for the Court's consideration of the "not otherwise available" provision of Section 6103(k)(6), the more persuasive evidence comes from the testimony of Jackson.

22

Jackson simply says he did not make the alleged disclosures. If he did not make such disclosures, he could not have made a determination that he needed to make the disclosures to obtain information not otherwise available. For one to claim the need to make a disclosure to obtain information on the one hand and to claim he did not make the disclosures on the other hand is intellectually and logically inconsistent. The witnesses all testified that they cooperated with Jackson. The Government agents claim only two witnesses to be uncooperative. For those reasons, the Court finds that the Section 6103(k)(6) exception is not available to the Government.

C.    The Section 7431(b) Exception is not Available to the Government

Under Section 7431(b), an exception exists for making unauthorized disclosures as follows:

> No liability shall arise under this section with respect to any disclosure which results from a good faith, but erroneous, interpretation of section 6103.

The so called "good faith" exception is interpreted to be an objective standard. Would a reasonable IRS agent have known of the rights provided by [6103] and his own agency's applicable regulations and internal rules? *Diamond v. U.S.*, 944 F.2d 431, 435 68 A.F.T.R. 2d 91-5607 (8th Cir. 1991)(citing *Huckaby v. U.S.*, 794 F.2d 1041 (5th Cir. 1986)). The burden of establishing the good faith defense rest solely with the Government. *Jones v. U.S.*, 97 F.3d 1121, (8th Cir. 1996).

The Government introduced into evidence a memorandum to special agents (Exhibit DX51). In substance, the memorandum from Chief, Criminal Investigation, to CI Special Agents in Charge, states that a case agent can disclose that the subject is under investigation, but not that the subject is under criminal investigation. While the Court might consider that the agent acted in good faith by following the mandate of the memorandum, the memorandum actually contradicts the explicit statutory language of Section 6103(b)(2). "Under Section 6103(b)(2), disclosures of a taxpayer's

23

name and the fact that he is under investigation constitutes, by definition, disclosure of return information." *Diamond* at 437, 9.3.1.2.2.(1)(b) Internal Revenue Manual (Exhibit P14).

Jackson's knowledge of the disclosure provisions under Section 6103 should have been reasonably fresh. Within approximately one year from his participation in the mandatory disclosure training, Jackson became the case agent in this investigation. Jackson testified at trial and plaintiffs agreed that Jackson was trained and knowledgeable on the issue of disclosure of return information. The Court has found him to be knowledgeable in disclosure issues. "A reasonable agent can be expected to know the provisions of Section 6103 . . .[which] may be further clarified by IRS Regulations and other IRS interpretations." *Huckaby v. United States Dept. of Treasury, I.R.S.*, 794 F.2d 1041, 1049 (5th Cir. 1986).

The evidence overwhelmingly demonstrates multiple unauthorized disclosures of plaintiffs' respective return information in the form of affirmative statements that Plaintiffs were involved in the commission of various tax and non-tax crimes. In *May v. U.S.*, (D. Mo 1995) 76 A.F.T.R. 2d 95-7222, 95-2 USTC ¶ 50605, aff'd (8th Cir. 1998), 81 A.F.T.R. 2d 98-953, 141 F.3d 1169, 98-1 USTC ¶ 50220, cert. den. 525 U.S. 873, 142 L.Ed.2d. 140 (1998), the court held that it was improper for an agent to make oral statements to third-parties regarding taxpayer's possible liability for tax crimes when the IRS had not instructed its agents to make such statements; no reasonable agent could have believed in good faith that the disclosures were authorized.

Jackson went far beyond the minimal identification of the subject and that there was an investigation in process. He also conceded that he did not rely on good faith (Tr. Vol. II, 867:13-14). The Court has found a total of 78 Section 6103 disclosures. The Section 7431(b) exception is not available to the Government.

24

D.    Damages

1.    Actual Economic Damages

The Court finds that as a direct result of the improper disclosures to the Holiday Inn Sun Spree and The Knolls Condominiums by Jackson, NSS lost accounts receivable of $9,794.63.

2.    Statutory Damages

Section 7431(c) provides that the measure of damages is $1,000.00 for each unlawful disclosure of return information, or the sum of actual damages sustained, whichever is greater, plus in the case of willful disclosures or disclosures that are the result of gross negligence, punitive damages, costs of litigation plus reasonable attorney fees under Section 7430(c)(4), if plaintiff is a prevailing party.

NSS is no longer operating, but that does not suggest or preclude the Court from a determination of damages. In fact, it would be error not to do so. *Marre v. U.S.*, 38 F.3d 823, 827-828, 74 A.F.T.R. 2d 94-7050, 94-2 USTC P 50, 615 (5th Cir. 1994), rehearing denied.

Having found 44 unlawful disclosures with respect to Snider, the Court awards plaintiff Snider $44,000.00 in statutory damages.

Having found 29 unlawful disclosures with respect to Turley, the Court awards plaintiff Turley $29,000.00 in damages.

Having found 4 additional unlawful disclosures with respect to NSS, other than those made to the Holiday Inn Sun Spree and The Knolls Condominiums, the Court awards plaintiff NSS an additional $4,000.00 in statutory damages.

3.    Punitive Damages

The remaining issue is whether Jackson made willful disclosures of Plaintiffs' return

25

information or disclosures that were the result of gross negligence.

*Barrett v. U.S.*, 100 F.3d 35 (5th Cir. 1997) has defined willful as, "that which was done without ground for believing that it was lawful or conduct marked by careless disregard of whether one has a right to act in such a manner." With respect to gross negligence, "conduct that is grossly negligent is that which is either willful or marked by wanton or careless disregard of the rights of another." *Barrett* at 40. In *Ward v. U.S.*, infra, the agent made a disclosure of return information on the basis that the taxpayer had personally disclosed the same information. The agent testified that he did not know that subsequent disclosures were prohibited. The court found his conduct negligent and awarded punitive damages.

In *Siddiqui v. U.S.*, 359 F.3d 1200, 1201, 93 A.F.T.R. 2d 2004-1305, 2004-1 USTC P 50,193 (9th Cir. 2004), the agent, during a retirement roast, stated to his colleagues:

> [a]nd from the owner of Bagel Brothers, Bagel Nosh, I almost said that right, Bagel Nosh. An item of evidence that you missed at the search of the Vullo's [sic] and ah Siddiqui's [sic] house. They want you to have it. It says tax evasion evidence inside. It's still a pending case.

The Government in that case stipulated this conduct to be gross negligence.

Jackson's conduct in this case is more egregious because his statements are to third-party witnesses and not IRS colleagues.

Key to the determination of gross negligence and willfulness is that the post-complaint conduct of Jackson remained unchanged. The interviews of witnesses Donald Hofstetter, Amelia Cortez, Nina Gennetten, Gene Gennetten, Shane Callendar, Noi Martin, Anna Worcester and LaShawn Snider all occurred between one month and 26 months after the Complaint was filed in this case.

26

The Court has determined that the following factors weigh heavily on the Section 7431(c)(1)(b)(ii) determination of willfulness or gross negligence.

1.     The number of disclosures

2.     The post-Complaint continued disclosures

3.     Conduct below the ordinary standard of care of the IRS in investigations

4.     Jackson's conduct constituted a blatant violation of 26 U.S.C. § 6103.

5.     Jackson's conduct, in light of his prior training and IRS regulations, was in reckless disregard of the law and the rights of Plaintiffs.

6.     No reasonable agent could have believed in good faith that disclosures that Plaintiffs were involved in the commission of various tax and non-tax crimes, were authorized. See *May*, supra.

These factors, as well as the Court's findings of fact, cause the Court to conclude that Jackson made willful disclosures of plaintiffs' return information or such disclosures were the result of gross negligence.

The Court awards punitive damages to Snider in the amount of $88,000.00, to NSS in the amount of $27,589.26, and to Turley in the amount of $58,000.00. Such award is clearly within the mandate of *BMW of North America, Inc. v. Gove*, 517 U.S. 559, 116 S.Ct. 1589 134 L.Ed.2d 809 (1998).

The Court finds that in addition to Plaintiffs' respective actual, statutory, and punitive damages, plaintiffs, as the "prevailing party," are entitled to recover their respective costs and reasonable attorney fees. See *Huckaby v. United States Department of the Treasury*, [87-1 USTC ¶ 9122], 804 F.2d 297 (5th Cir.1986) (pursuant to 26 U.S.C. § 7430(a) a prevailing party in suit

Case 2:02-cv-04066-SOW   Document 78   Filed 07/26/05   Page 27 of 28

brought under 26 U.S.C. § 7431 is entitled to recover reasonable litigation costs which includes reasonable attorney's fees).

Accordingly, it is hereby

ORDERED that based upon the foregoing findings of fact and conclusions of law:

Plaintiff Turley is entitled to a judgment in her favor and against Defendant in the amount of $29,000.00 in statutory damages and $58,000.00 for punitive damages. It is further

ORDERED that plaintiff Snider is entitled to a judgment in his favor and against Defendant in the amount of $44,000.00 in statutory damages and $88,000.00 for punitive damages. It is further

ORDERED that plaintiff NSS is entitled to a judgment in its favor and against Defendant in the amount of $9,794.63 for its actual economic damages, $4,000.00 in statutory damages, and $27,589.26 for punitive damages. It is further

ORDERED that absent stipulation by the parties as to the amount of reasonable attorneys' fees and costs, plaintiffs' counsel shall submit, within thirty (30) days from entry of this order, their respective itemized bills setting forth the ***reasonable*** attorneys' fees and costs incurred in bringing these actions, as well as affidavits supporting the fees and costs. Within twenty (20) days from the date of Plaintiffs' filings, Defendant may file its specific objections to any of the fees and costs sought.

 

                                           _____

                                           SCOTT O. WRIGHT
                                           Senior United States District Judge

Date: _____

Case 2:02-cv-04066-SOW   Document 78   Filed 07/26/05   Page 28 of 28